**Appeal No. 2023-1648**

# United States Court of Appeals
# For The Federal Circuit

———◆◆◆———

SHAMROCK BUILDING MATERIALS, INC.,

*Plaintiff-Appellant,*

—v.—

UNITED STATES,

*Defendant-Appellee.*

———————————

Appeal from the United States Court of International Trade
in Case No. 20-00074, Timothy C. Stanceu, Judge

## BRIEF FOR DEFENDANT-APPELLEE, UNITED STATES

BRIAN M. BOYNTON
Principal Deputy Assistant
Attorney General

PATRICIA M. MCCARTHY
Director

JUSTIN R. MILLER
Attorney-in-Charge
International Trade Field Office

MARCELLA POWELL
Senior Trial Counsel
Civil Division, U.S. Dept. of Justice
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
Tel. No. (212) 264-9230
*Attorneys for Defendant-Appellee*

VALERIE SORENSON-CLARK
International Trade Litigation
U.S. Customs and Border Protection

Dated: September 22, 2023

# TABLES OF CONTENTS

ISSUE PRESENTED ........................................................................... 1

STATEMENT OF THE CASE .............................................................. 2

   I.   The Merchandise At Issue ......................................................... 3

   II.   The Trial Court's Decision ....................................................... 7

SUMMARY OF THE ARGUMENT .................................................... 11

ARGUMENT ...................................................................................... 13

   I.      STANDARD OF REVIEW .................................................. 13

   II.     THE APPLICABLE LEGAL FRAMEWORK ...................... 14

   III.   THE TRIAL COURT CORRECTLY HELD THAT THE
         IMPORTED ELECTRICAL CONDUIT IS CLASSIFIABLE
         IN HEADING 7306, HTSUS ............................................... 14

   IV.   THE TRIAL COURT CORRECTLY HELD THAT THE IMPORTED
         ELECTRICAL CONDUIT IS NOT CLASSIFIABLE IN HEADING
         8547 ...................................................................................... 16

       A.  The Trial Court Correctly Interpreted Heading 8547, HTSUS – The
           Common Meaning Of The Term "Lined With Insulating Material"
           Requires The Insulating Materials To Significantly Impede The Flow
           Of Electricity ...................................................................... 17

       B.  Shamrock's Electrical Conduit Is Not "Lined With Insulating
           Material" ............................................................................ 20

   V.     THE TRIAL COURT CORRECTLY REJECTED SHAMROCK'S
         OVERLY BROAD INTERPRETATION OF THE TERM "LINED
         WITH INSULATING MATERIAL" ....................................... 25

i

VI.     THE TRIAL COURT DID USE THE EXPLANATORY NOTES TO IMPROPERLY INTERPRET THE TERMS OF HEADING 8547 ...... 31

VII.     THE TRIAL COURT DID ERR REGARDING THE EXEMPLAR OF THE EXPLANATORY NOTE TO HEADING 8547 – INSULATING VARNISH ........................................................................................... 33

VIII.     THE TRIAL COURT IS NOT BOUND BY ADMINISTRATIVE RULINGS ............................................................................................. 36

CONCLUSION ..................................................................................... 39

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Brookside Veneers, Ltd. v. United States,*
847 F.2d 786 (Fed. Cir. 1988)................................................................ 17

*Camelbak Prods., LLC v. United States*,
649 F.3d 1361 (Fed. Cir. 2011)............................................................. 14

*Carl Zeiss, Inc. v. United States*,
195 F.3d 1375 (Fed. Cir. 1999)............................................................. 14

*Chemtall, Inc. v. United States*,
878 F.3d 1012 (Fed. Cir. 2017).............................................................. 8

*E.M. Chems. v. United States,*
920 F.2d 910 (Fed. Cir. 1990)............................................................... 16

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
582 F.3d 1288 (Fed. Cir. 2009)............................................................. 35

*Gerson Co. v. United States*,
898 F.3d 1232 (Fed. Cir. 2018)............................................................. 25

*GRK Canada, Ltd v. United States*,
885 F.3d 1340 (Fed. Cir. 2018)............................................................. 30

*Heartland By-Products, Inc. v. United States*,
264 F.3d 1126 (Fed. Cir. 2001)............................................................. 35

*Inter-Maritime Forwarding Co., Inc. v. United States*,
70 Cust. Ct. 133 (1973).................................................................. 29, 30

J.C. *Penny Purchasing Corp. v. United States*,
10 CIT 727 (1986)............................................................................... 20

*James v. United States*,
48 CCPA 75 (1961)............................................................................. 16

*King v. Burwell*,
576 U.S. 473, 135 S. Ct. 2480 (2015).................................................. 26

*La Crosse Tech. v. United States*,
723 F.3d 1353 (Fed. Cir. 2013)............................................................ 26

*Lerner New York, Inc.*,
908 F. Supp. 2d ................................................................................... 35

*Marubeni Am. Corp. v. United States,*
35 F.3d 530 (Fed. Cir. 1994)................................................................ 17

*MetChem, Inc. v. United States*,
513 F.3d 1342 (Fed. Cir. 2008)............................................................ 35

*Mondiv, Div. of Lassonde Specialties Inc. v. United States*,
42 CIT ——, 329 F. Supp. 3d 1331 (2018)........................................... 27

*Naftone, Inc. v. United States*,
67 Cust. Ct. 341 (1971).................................................................. 29, 30

*Orlando Food Corp. v. United States*,
140 F.3d 1437 (Fed. Cir. 1998)....................................................... 13, 27

*Peterson Electro Musical Prod. v. United States*,
7 CIT 293 (1984)................................................................................. 20

*Pillowtex Corp. v. United States*,
171 F.3d 1370 (Fed. Cir. 1999)............................................................ 13

*Pillsbury Co. v. United States*,
431 F.3d 1377 (Fed. Cir. 2005)............................................................ 20

*R.T. Foods, Inc. v. United States*,
757 F.3d 1349 (Fed. Cir. 2014)............................................................ 27

*Shamrock Building Materials, Inc. v. United States,*
Slip. Op. 20-74 (March 25, 2022).......................................................... 7

*Sigma-Tau Health Science, Inc. v. United States,*
838 F.3d 1272 (Fed. Cir. 2016) ........................................................... 12

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944)...................................................................... 34, 35

*Toyota Motor Sales, U.S.A., Inc. v. United States*,
7 Ct. Int'l Trade 178 (1984),
*aff'd,* 753 F.2d 1061 (Fed. Cir. 1985) .................................................... 17

*Trans-Border Custom Serv. v. United States*,
18 Ct. Int'l Trade 22 (1994) .................................................... 14

*United States v. Clay Adams Co.,
Inc.*, 20 CCPA 285 (1932) .................................................... 14

*United States v. Esso Standard Oil Co.,*
42 CCPA 144 (1955) .................................................... 16

*United States v. Mead Corp.*,
533 U.S. 218 (2001) .................................................... 35

*Victoria's Secret Direct, LLC v. United States,*
769 F.3d 1102 (Fed. Cir. 2014) .................................................... 13

**Harmonized Tariff Schedule of the United States**

General Rule of Interpretation 1 ....................................... 7, 13, 14, 23, 27

General Rule of Interpretation 6 ....................................... 10, 28

Chapter 73

  Heading 7306 ...................................................... *passim*

    Subheading 7306.30.10.................................................... 2

    Subheading 7306.30.50.................................................... 2

Explanatory Note to Chapter 73 ....................................... 15, 31

Explanatory Note 7306 ....................................... 16, 30, 31

Chapter 85

  Heading 8546 ...................................................... *passim*

Heading 8547 .......................................................................... *passim*

Heading 85.47  .................................................................................. 30

Heading 8547.10 ............................................................................... 26

Heading 8547.20 ............................................................................... 26

Explanatory Note to 8547 .............................................................. *passim*

Chapter 99

  Heading 9903

    Subheading 9903.80.01................................................................... 2

Section XV ............................................................... 7, 16, 18, 19

Note 1(f) to Section XV ................................................................. 18

Section XVI ..................................................................... 7, 16

Section 773.30................................................................................... 29

**Statutes**

19 U.S.C. § 1862 ......................................................................... 2, 3

**Other Authorities**

INSULATING, *Oxford Dictionary*,
available at https://www.oed.com/view/Entry/97228............................................ 17

INSULATING, *Merriam Webster*,
available at https://www.merriam-webster.com/dictionary/insulating.................. 17

INSULATE, *Cambridge Dictionary*,
available at https://dictionary.cambridge.org/us/dictionary/english/insulating..... 17

## <u>STATEMENT OF RELATED CASES</u>

In accordance with Rule 47.5 of the Rules of the United States Court of Appeals for the Federal Circuit, counsel for Appellee makes the following statements:

(1)    There are no other appeals arising from the decision of the United States Court of International Trade that is the subject of this action now pending before this or any other court of appeals.

(2)    The following actions are pending before the United States Court of International Trade and are likely to be affected by this Court's decision in this appeal: *Shamrock Building Materials, Inc. v. United States*, Court No. 21-00571.

2023-1648

---

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

SHAMROCK BUILDING MATERIALS, INC.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

---

Appeal from the United States Court of International Trade
in Court No. 20-00074, Honorable Timothy C. Stanceu.

---

**BRIEF FOR DEFENDANT-APPELLEE, UNITED STATES**

**ISSUE PRESENTED**

Whether the United States Court of International Trade correctly held that the imported electrical metallic tubing conduit (EMT) and intermediate metallic tubing conduit (IMC) at issue are correctly classified in heading 7306, Harmonized Tariff Schedule of the United States (HTSUS), which provides for "[o]ther tubes, pipes and hollow profiles (for example, open seamed or welded, riveted or similarly closed) of iron or steel."

## STATEMENT OF THE CASE

This appeal involves the proper tariff classification of electrical metallic tubing conduit (EMT) and intermediate metallic tubing conduit (IMC) (collectively referred to as electrical conduit) imported by appellant, Shamrock Building Materials, Inc. (Shamrock).  U.S. Customs and Border Protection (CBP or Customs) liquidated the entries of electrical conduit under heading 7306, HTSUS[1,] which covers "[o]ther tubes, pipes and hollow profiles (for example, open seamed or welded, riveted or similarly closed), of iron or steel . . ." duty free.

---

[1] The electrical conduit tubing was classified in the following subheadings in heading 7306, HTSUS, depending on the thickness of the wall of the conduit:

Subheading 7306.30.10, HTSUS, which provides for:  "[o]ther tubes, pipes and hollow profiles (for example, open seamed or welded, riveted or similarly closed), of iron or steel: Other, welded, of circular cross section, of iron or nonalloy steel; having a wall thickness of less than 1.65 mm . . . "

Subheading 7306.30.50, HTSUS, which provides for:  "[o]ther tubes, pipes and hollow profiles (for example, open seamed or welded, riveted or similarly closed), of iron or steel: Other, welded, of circular cross section, of iron or non alloy steel:  having a wall thickness of 1.65 mm or more: Other: Other: With an outside diameter not exceeding 114.3 mm: galvanized: internally coated or lined with a non-electrically insulating material, suitable for use as electrical conduit . . . ."

Both subheadings of 7306 are duty-free, but at the time the electrical conduit was entered, merchandise classifiable under heading 7306 and imported from Mexico was subject to a 25 percent duty imposed pursuant to section 232 of the Trade Expansion Act of 1962 (19 U.S.C. § 1862) (section 232 duties).  *See* Subheading 9903.80.01, HTSUS (2018 Rev. 5).

Shamrock contends that the correct tariff classification of the electrical conduit is heading 8547, HTSUS[2], as "[e]lectrical conduit tubing and joints therefor, of base metal lined with insulating material . . ." at a duty rate of 4.6 percent *ad valorem*.  The trial court upheld CBP's determination that the imported electrical conduit is classifiable in heading 7306, HTSUS, and the trial court's decision should be affirmed.

## I.    The Merchandise At Issue

The subject electrical conduit consists of welded hollow concentric tubes constructed of steel that is galvanized on the outer surface and coated on the inside with organic compound or coating.  *See* Samples, Appx2369, Appx0901, Appx0910.  The conduit is sold in ten-foot lengths, at varying diameters, and is threaded at both ends.  Appx0905, Appx0909.  Each ten-foot piece of electrical conduit can be connected to another with a steel threaded coupling.  Appx0908-Appx0909.  The conduit is suitable for use in routing and protecting wiring circuits (*e.g.*, 110-volt circuits) in commercial and residential buildings.  Appx0007, Appx2369.

---

[2] Specifically, Shamrock claims that the electrical conduit is properly classifiable in subheading 8547.90.00, HTSUS, which provides for "[i]nsulating fittings for electrical machines, appliances or equipment, being fittings wholly of insulating material apart from any minor components of metal (for example, threaded sockets) incorporated during molding solely for the purposes of assembly, other than insulators of heading 8546; electrical conduit tubing and joints therefor, of base metal lined with insulating material: Other . . ."

3

Once coupled together, the pieces of electrical conduit form a "raceway" used to route electrical wires from one location to another. Appx0007. In addition to routing the wires, the electrical conduit serves to contain the electrical wires once installed in the conduit tubing and to provide physical protection from damage due to outside or external forces. Appx0007, Appx0950.

Shamrock does not produce its electrical conduit but rather purchases it from a company, Rymco (also known as Conduit S.A. de C.V.). Appx0007. Rymco manufactures the electrical conduit by rolling flat pieces of steel into the shape of a tube and welding the seam together. Once the shape is formed, the steel tube is coated on the outside with zinc and on the inside with epoxy enamel (the interior coating). Appx0007, Appx00939-Appx0942. The zinc coating galvanizes the product to prevent rust. Appx0941-Appx0942. The interior coating provides for the "easy installation of wire" by protecting against damage to the wiring by reducing friction when the wires are pulled through the interior of the steel tube and it stops corrosion. Appx0008.

Shamrock has a product brochure that highlights the features and benefits of the electrical conduit. Shamrock's product brochure states that the "interior coating insulates [the] wall to provide easy installation of wires" and that the electrical conduit provides the benefit of "[p]hysical and mechanical protection." Appx1588-Appx1589. Shamrock is not aware of any customers who purchase its

4

electrical conduit because the interior coating provides electrical insulation.
Appx0008.

Shamrock's product brochure also indicates that the electrical conduit
complies with several electrical industry standards, including American National
Standard (ANSI) C80.3, Underwriters Laboratory (UL) 797, and National
Electrical Code (NEC) Article 358.  Appx1588-Appx1589; Appx0985-Appx0986,
Appx1019, Appx1026-Appx1027, Appx1035; Appx1458.  According to those
standards, electrical conduit is capable "for use as an equipment grounding
conductor" and of providing "for the electrical continuity required of an equipment
grounding conductor."  Appx1594-Appx1630; Appx1632-Appx1648; Appx1650-
Appx1651.  For conduit to operate as an equipment grounding conductor, its
interior wall must be capable of conducting electricity in the event of an electrical
fault occurring inside the conduit tubing.  Appx1494, Appx1498-Appx1499.

The material used to coat the interior of the electrical conduit was produced
by a company named Pinturas Diamex S.A.  Appx0954-Appx0955.  The interior
coating is comprised of epoxy resin, melamine resin, and silicone additives, along
with other materials.  Appx1591.  The precise composition of the coating is
proprietary to Pinturas Diamex S.A.  Appx1591.  The coating is transparent, which
allows the steel surface of the conduit to be visible, and measures between 10 and

60 microns.  Samples, Appx2369.  The interior coating provides protection against rust and reduces friction.  Appx0950.

Both parties performed electrical testing on the interior coating of the electrical conduit to determine how much electricity the interior coating resists by applying electrical current to the material.  The Government's expert witness, Dr. Athanasios Meliopoulos, applied various levels of voltage to the interior coating (0.034 to 0.219 volts, *i.e.*, 34-29 millivolts).  The interior coating resists a very slight amount of electricity – approximately 3-14 milliohms (0.003-0.013 ohms) of resistance – depending on the amount of electrical current applied.  Appx1494-Appx1586; Appx1237.

Plaintiff's witness, Dr. Joshua E. Jackson, performed three sets of tests on the electrical testing on the electrical conduit:  four-point resistance testing, two-point resistance testing, two-point electrical resistance testing, and voltage analysis.  Appx0703-Appx0704.  The testing consisted of comparing the electrical resistance of uncoated conduit and coated conduit.  Dr. Jackson recorded that the four-point test measured an electrical resistance of 70-120 milliohms (0.07-0.12 ohms) and the two-point test measured 0.7-1.2 ohms.  As a result of these findings, Dr. Jackson concluded that the interior coating "provides slightly higher electrical resistance than an uncoated pipe but does not act as an insulator."  Appx0703-Appx0704.  According to Dr. Jackson, a material that provides a slight electrical

resistance does not qualify as an electrical insulator and, in his opinion, the interior

coating of the electrical conduit does not insulate against electricity. Appx1654-

Appx1656, Appx0664. Neither Shamrock's fact witness, Dr. Jackson, nor

defendant's expert witness, Dr. Meliopoulos, considered the degree of resistivity or

resistance of the coating sufficient to qualify it as an insulator. Appx2370.

In addition to the analysis of electrical resistance, Dr. Jackson noted that

areas of the interior of the electrical conduit were not completely covered with the

epoxy coating. Appx0660, Appx1654-1656.

Shamrock's expert, Dr. Jeffrey Gotro, is a metallurgist and materials

engineer who conducted an analysis that was limited to confirming the existence of

epoxy, melamine, and silicone in the interior coating of the electrical conduit. Dr.

Gortro stated that epoxy, melamine, and silicone are generally electrically

insulating but he did not opine on the interior coating of the electrical conduit.

Appx0333. According to Dr. Gotro, if an epoxy is filled with a metal additive it

would be rendered electrically conducive. Appx0308. His conclusion that the

coating is an "electrically insulating material" is merely a deduction based upon

the known chemicals in its composition. Appx0351-Appx0352. Dr. Gotro did not

conduct any electrical testing on the electrical conduit or coating but rather his

conclusion was drawn exclusively from his determination as to the chemical

composition of the interior coating. Appx0328-Appx0332, Appx0334-Appx0335.

7

Dr. Gotro did not examine samples of the conduit, did not receive the complete chemical composition of the coating, and did not receive information regarding how the coating was applied to the conduit.  Appx0323.

## II.    The Trial Court's Decision

The trial court issued *Shamrock Building Materials, Inc. v. United States*, Slip Op. 23-2 (March 13, 2023) (Appx0001-0021), following the parties' cross-motions for summary judgment.  Prior to ruling on the motions, the trial court held oral argument and visually inspected samples of the merchandise.  The trial court granted the Government's motion for summary judgment.

Pursuant to General Rule of Interpretation 1 (GRI 1), the trial court examined each of the competing tariff headings at issue, namely heading 8547, HTSUS, which covers "[e]lectrical conduit tubing and joints therefor, of base metal lined with insulating material," and heading 7306, HTSUS, which covers "[o]ther tubes, pipes and hollow profiles (for example, open seamed or welded, riveted or similarly closed), of iron or steel."  Heading 7306 is within Section XV of the HTSUS while heading 8547 is within Section XVI.  Next, the trial court acknowledged that Note 1(f) to Section XV states that Section XV "does not cover: . . . Articles of section XVI (machinery, mechanical appliances and electrical goods)."  Pursuant to the directives of Note 1(f), the trial court considered, as a threshold matter, whether the electrical conduit is covered by

8

heading 8547, HTSUS.  If so, then the electrical conduit is classifiable in that

heading and precluded from classification in heading 7306.  Appx0013.

The undisputed facts in the record established that the imported conduit at

issue is "electrical conduit tubing" that is made of base metal.  Appx0013.

Therefore, the sole issue presented to the trial court was whether the electrical

conduit was "lined with insulating material" "within the meaning of that term as it

appears in the article description" for heading 8547.  Appx0013.  The trial court

did not "view the phrase 'electrical conduit tubing . . . of base metal lined with

insulating material' as free of ambiguity."  Appx0015.  Resultantly, the trial court

queried whether, for purposes of classification in heading 8547, the lining is

required to "effectively 'insulate' the wire (or wires), once installed, from the

inner surface of the steel conduit, or is it sufficient that it performs some other

function?" Appx0015.

The trial court consulted the Explanatory Notes[3] to heading 8547, HTSUS,

for guidance as to the meaning and scope of the heading.  The trial court noted

that the Explanatory Notes draw a distinction between electrical conduit tubing

that is "insulated" and electrical conduit tubing that is "uninsulated," and that

"uninsulated" tubing is classifiable in heading 7306, HTSUS.  Appx0016.  The

---

[3] "The [Explanatory Notes] provide persuasive guidance and are generally
indicative of the proper interpretation, though they do not constitute binding
authority."  *Chemtall, Inc. v. United States*, 878 F.3d 1012, 1019 (Fed. Cir. 2017).

trial court then considered the factual evidence in the record to determine whether

the electrical conduit was "insulated electrical conduit."

The trial court found that the "uncontested facts are inconsistent with a

finding that the coating 'insulates' the interior wire so as to impede the transfer of

electrical current or heat when the conduit is used for its intended purpose."

Appx0016-Appx0017.  While the subject conduit provides some measurable

resistance or resistivity, the trial court held that the uncontested facts "demonstrate

that the degree of resistivity is not significant in relation to the intended use of the

conduit."  The coating does not qualify as an insulator.  Appx0017.  The trial court

noted that both parties measured the resistivity of the coating inside the conduit

and that those measurements showed that the conduit would not "significantly"

"impede[] the flow of electrical current in the type of wiring circuits that would be

found in or around residential or commercial buildings."  Appx 0017.  The court

also found that the thin interior coating (10 to 60 microns) did not provide

"meaningful protection from overheated wiring in such circuits."  Appx0017.

The trial court held that heading 8547, HTSUS, "in a common and

commercial context" describes "electrical conduit that performs an insulating

function necessary or desirable for electrical wiring in applications for which the

conduit is designed and for which it is marketed in commerce."  Appx0018.

According to the court, construing the term "insulating" in conjunction with the

term "electrical conduit" shows that the insulating layer must function in a way that relates to the "electrical conduit" function.  Appx0018.

Finally, pursuant to GRI 6, the trial court held that the electrical conduit meets the legal criteria for classification in subheadings 7306.30.10 and 7306.30.50, HTSUS, and thus they are the correct subheadings for the subject electrical conduit.  Appx0020.

## SUMMARY OF THE ARGUMENT

The trial court's decision should be affirmed.  The trial court properly classified the electrical conduit in heading 7306, HTSUS, which provides for "[o]ther tubes, pipes and hollow profiles (for example, open seamed or welded, riveted or similarly closed), of iron or steel . . ."  The terms of heading 7306, HTSUS, precisely describe the electrical conduit.

Shamrock presents a myriad of unsupported and unpersuasive arguments in an effort to show that the trial court erred when it held that the electrical conduit is not classifiable in heading 8547, HTSUS, as "electric conduit tubing lined with insulating material."  First, Shamrock takes issue with the trial court's interpretation of the term "lined with insulating material" in heading 8547, HTSUS.  The trial court performed a comprehensive and correct analysis of the relevant tariff terms and Explanatory Notes.  The terms "electric conduit tubing" *and* "lined with insulating material" appear in the heading and, thus, should be

11

interpreted together.  Accordingly, the insulating material must relate to the function of the "electric conduit tubing."  The trial court correctly held that heading 8547, HTSUS, describes electrical conduit that performs an insulating function necessary or desirable for electrical wiring in applications for which the conduit is designed and for which it is marketed in commerce.  The trial court correctly found that Shamrock's electrical conduit tubing, which is used in residential and commercial buildings, did not satisfy that criteria.

During the oral argument on the parties' dispositive motions, Shamrock agreed that its witness, Dr. Jackson, did not consider the degree of resistivity or resistance of the coating sufficient to qualify it as an insulator.  Shamrock also agreed that its product is not marketed to customers as insulated or insulating electrical tubing.  Indeed, Shamrock's sales brochure makes no mention of electrically insulating properties.  Moreover, Shamrock's expert, Dr. Gotro, provided an opinion that was based merely on deduction.  He never tested the interior coating to determine whether it impeded the flow of electricity.  Dr. Gotro does not know the complete composition of the coating because he did not perform any testing to determine the composition.  Dr. Gotro did not inspect samples of the electrical conduit.  Dr. Gotro simply opined that melamine, silicone, and epoxy – in general – have insulating properties.

Shamrock also argues that the trial court improperly construed the Explanatory Note to heading 8547, HTSUS. Shamrock is wrong. The trial court used the traditional tools of statutory construction to ascertain the common meaning of heading 8547, HTSUS, and then consulted the Explanatory Notes for guidance as to the scope of electrical conduit covered by the heading. The Note assists with distinguishing between goods that are classifiable in heading 8547 and goods that are classifiable in heading 7306. The Note also provides a strong indication that "lined with insulating materials" refers to materials that must perform the function of insulation in relation to the conduit. The trial court properly consulted and interpreted the Explanatory Note.

Last, contrary to Shamrock's assertion, the epoxy coating is not an "insulating varnish." Shamrock does not advertise its conduit as being treated with insulating varnish and has not produced any documents that show that the epoxy coating meets the actual industry standards for such varnish.

For these reasons, and those shown below, the trial court's judgment should be affirmed.

## ARGUMENT

## I. STANDARD OF REVIEW

This Court reviews a classification decision in two steps. First, the Court ascertains the meaning of the applicable tariff terms – a question of law that this

Court reviews *de novo*. *Sigma-Tau HealthScience, Inc. v. United States*, 838 F.3d 1272, 1276 (Fed. Cir. 2016). The Court then assesses whether the trial court correctly determined that a particular imported product falls within the tariff term at issue – a question of fact that this Court reviews for clear error. *Victoria's Secret Direct, LLC v. United States,* 769 F.3d 1102, 1106 (Fed. Cir. 2014).

## II.    THE APPLICABLE LEGAL FRAMEWORK

The classification of merchandise under the HTSUS is governed by the principles set forth in the General Rules of Interpretation (GRI) and the Additional U.S. Rules of Interpretation (ARI). *See Orlando Food Corp. v. United States*, 140 F.3d 1437, 1439 (Fed. Cir. 1998). The GRIs are applied in numerical order. If the proper classification is achieved through a particular GRI, the remaining successive GRIs should not be considered. *Id.* at 1440. GRI 1 provides: "for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes and, provided such headings or notes do not otherwise require, according to the [remaining GRIs.]"

As GRI 1's Explanatory Note explains, "the terms of the headings and any relative section or Chapter Notes are paramount, *i.e.*, they are the first consideration in determining classification." Thus, the first step in analyzing a classification issue is to examine the terms of the provisions in issue in order to determine legislative intent. *See Pillowtex Corp. v. United States*, 171 F.3d 1370,

14

1373 (Fed. Cir. 1999).  In that regard, GRI 1 is consistent with the master rule of tariff construction, which is to interpret statutes to achieve legislative intent, *United States v. Clay Adams Co., Inc.*, 20 CCPA 285 (1932), and all rules of construction must yield to that intent.  *Trans-Border Custom Serv. v. United States*, 18 Ct. Int'l Trade 22, 25 (1994), *aff'd*, 76 F.3d 354 (Fed. Cir. 1996).

The Explanatory Notes to the HTSUS provide guidance in interpreting tariff provisions but are not binding.  *Marubeni Am. Corp. v. United States*, 35 F.3d 530, 535 n.3 (Fed. Cir. 1994) (stating Explanatory Notes, while not dispositive or binding, are instructive).

In this appeal, the parties do not dispute that the merchandise at issue is "electrical conduit tubing" within the meaning of heading 8547, HTSUS. Shamrock challenges the trial court's interpretation of the tariff term "lined with insulating material."  As we show below, the trial court correctly interpreted the language of heading 8547, HTSUS, and correctly held that Shamrock's electrical conduit tubing is not "lined with insulating material."

## III.  THE TRIAL COURT CORRECTLY HELD THAT THE IMPORTED ELECTRICAL CONDUIT IS CLASSIFIABLE IN HEADING 7306, HTSUS

GRI 1 states that "classification shall be determined according to the terms of the headings and any relative section or chapter notes . . . ."  An *eo nomine* provision "describes an article by a specific name."  *Carl Zeiss, Inc. v. United*

15

*States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999).  "Absent limitation or contrary legislative intent, an *eo nomine* provision 'include[s] all forms of the named article[,]' even improved forms."  *Camelbak Prods., LLC v. United States*, 649 F.3d 1361, 1364–65 (Fed. Cir. 2011) (citations omitted) (alternations in original).

Heading 7306, HTSUS, is an *eo nomine* provision because it covers "[o]ther tubes, pipe and hollow profiles (for example, open seamed or welded, riveted or similarly closed), of iron or steel."  The terms of heading 7306 are clear and unambiguous.  The subject electrical conduit is covered by heading 7306, HTSUS, because it is steel tubing.

The Explanatory Notes to Chapter 73, HTSUS, confirm that heading 7306, HTSUS, is the correct tariff classification for the merchandise.  Indeed, General Explanatory Note to Chapter 73, HTSUS, provides as follows:

> For the purposes of this Chapter, the expression "tubes and pipes" and "hollow profiles" have the following meanings hereby assigned to them:
>
> **(1) Tubes and pipes**
>
> Concentric hollow products, of uniform cross-section with only one enclosed void along their whole length, having their inner and outer surfaces of the same form. Steel tubes are mainly of circular, oval, rectangular (including square) cross-sections but in addition may include equilateral triangular and other regular convex polygonal cross-sections. . . . They may be polished, coated, bent (including coiled tubing), threaded and coupled or not, drilled, waisted, expanded, cone shaped

or fitted with flanges, collars or rings.

Here, the electrical conduit is made entirely of welded carbon steel, is of circular cross-section, and is threaded at the ends.  Appx0908-Appx0909.  The conduit is often referred to as steel tube or steel pipe.  Appx0899.  Based on these facts, the trial court correctly held that heading 7306, HTSUS, is the correct classification for the electrical conduit.

## IV.    THE TRIAL COURT CORRECTLY HELD THAT THE IMPORTED ELECTRICAL CONDUIT IS NOT CLASSIFIABLE IN HEADING 8547, HTSUS

Headings 8547 and 7306 cover mutually exclusive categories of electrical conduit.  Heading 7306, HTSUS, is within Section XV of the HTSUS while heading 8547 is within Section XVI.  According to Note 1(f) to Section XV, HTSUS, Section XV "does not cover: . . . Articles of section XVI (machinery, mechanical appliances and electrical goods)."  Thus, if the imported electrical conduit is classifiable in heading 8547, HTSUS, it cannot be classifiable in heading 7306, HTSUS.  *See also* Explanatory Note 73.06 (excluding "[i]nsulated electrical conduit tubing (heading 85.47)" from classification under heading 7306).

### A.    The Trial Court Correctly Interpreted Heading 8547, HTSUS – The Common Meaning Of The Term "Lined With Insulating Material" Requires The Insulating Materials To Significantly Impede The Flow Of Electricity

Heading 8547, HTSUS, is an *eo nomine* provision for "electrical conduit tubing lined with insulating material."  The tariff term "insulated" is not defined in

the HTSUS, or in any section or chapter note.  Where a tariff term is not defined, it is presumed to be used in its normal sense.  *See United States v. Esso Standard Oil Co.,* 42 CCPA 144, 151 (1955); *James v. United States*, 48 CCPA 75 (1961).  Such terms are construed in accordance with their common and commercial meaning, which are presumed to be the same.  *See E.M. Chems. v. United States,* 920 F.2d 910, 913 (Fed. Cir. 1990) ("[t]ariff terms are to be construed in accordance with their common and popular meaning, in the absence of a contrary legislative intent."); *Toyota Motor Sales, U.S.A., Inc. v. United States*, 7 Ct. Int'l Trade 178, 182 (1984), *aff'd,* 753 F.2d 1061 (Fed. Cir. 1985).  "To assist it in ascertaining the common meaning of a tariff term, the court may rely upon its own understanding of the terms used, and it may consult lexicographic and scientific authorities, dictionaries, and other reliable information sources."  *Brookside Veneers, Ltd. v. United States,* 847 F.2d 786, 789 (Fed. Cir. 1988).  *See also Marubeni Am. Corp. v. United States,* 35 F.3d 530, 534 (Fed. Cir. 1994).

Heading 8547 is included within Chapter 85 and Section XVI, HTSUS.  Both Chapter 85 and Section XVI cover "Electrical Equipment."  Similarly, the General Explanatory Note to Chapter 85, which describes the "Scope and Structure of the Chapter," provides that "[t]his Chapter covers all electrical machinery and equipment."  Explanatory Note (A) to Chapter 85, HTSUS.  Consequently, the

term "insulating material" must be interpreted as it relates to electrical conduit tubing and electrical equipment.

The term "insulating" has several meanings. But within the context of electricity, Oxford English Dictionary defines "insulating," in relevant part, as "[t]o cut off or isolate from conducting bodies by the interposition of non-conductors, so as to prevent the passage of electricity or heat." https://www.oed.com/view/Entry/97228, last visited August 10, 2022. Similarly, Merriam-Webster defines "insulating," in relevant part, as "to separate from conducting bodies by means of nonconductors so as to prevent transfer of electricity, heat, or sound" (https://www.merriam-webster.com/dictionary/insulating last visited August 10, 2022). The Cambridge Online Dictionary defines "insulate" as "to cover or surround something with a material or substance in order to stop heat, sound, or electricity from escaping or entering." https://dictionary.cambridge.org/us/dictionary/english/insulating, last visited August 10, 2022. The foregoing dictionaries make clear that, within the context of electricity, the term "insulating" is defined as preventing or stopping the flow of electricity.

The Explanatory Note to heading 8547 provides guidance as to the category of electrical conduit covered by the heading. The Explanatory Note states:

> This group covers the metal tubing used in permanent electrical installations (*e.g.*, house wiring) as insulation

19

and protection for the wires, **provided it has an interior lining of insulating material.** Uninsulated metal tubing, often used for the same purpose, is **excluded (Section XV).**"[4]

EN 85.47 (emphasis in original).

The Explanatory Note to heading 8547 states – with emphasis – that heading 8547 covers metal tubing used in permanent "electrical installations[,]" such as house wiring, "**provided it has an interior lining of insulating material**." (Emphasis in original.)  The Note further advises that "uninsulated metal tubing" that is used for the same purpose is excluded from Section XV (heading 7306). The Explanatory Note makes it clear that the HTSUS contemplates two categories of electrical conduit, namely, insulated electrical conduit (heading 8547) and uninsulated electrical conduit (heading 7306).

The Explanatory Note provides additional guidance by identifying the forms of electrical conduit covered by heading 8547 and identifying substances that may be "insulating material" for purposes of the heading.  The Note states:

> The tubing of this group consists either of spiralled metal strip wound on to an interior tube of insulating material, or of rigid metal tubing (usually iron or steel) coated or lined on the inside with insulating material. The insulating material may be special electrically insulating varnish, paper or paperboard, rubber, plastics, etc. Metal tubing simply coated with varnish to prevent corrosion is

---

[4] Section XV covers Heading 7306, which is the provision within which CBP liquidated the electrical conduit.

**excluded (Section XV).** (emphasis in original).

The Explanatory Note provides valuable guidance as to the scope of the heading by describing the use of the electric conduit, the form of the electrical conduit, and the materials that may be used to impart insulation to the conduit. As we show below, Shamrock's electrical conduit does not fall within the purview of heading 8547, HTSUS, and it is also not described by the Explanatory Note.

### B.    Shamrock's Electrical Conduit Is Not "Lined With Insulating Material"

Based on the undisputed facts in the record and a visual inspection of samples of Shamrock's electrical conduit, the trial court correctly held that the conduit is not classifiable in heading 8547, HTSUS, because it does not significantly impede the flow of electrical current in the type of wiring circuits that would be found in or around residential or commercial buildings. Appx0017.

As indicated in the background, both parties performed electrical testing on the interior coating of the electrical conduit to determine how much electricity the interior coating resists by applying electrical current to the material. The Government's expert witness, Dr. Meliopoulos, applied various levels of voltage to the interior coating (0.034 to 0.219 volts, *i.e.*, 34-29 millivolts). The results established that the interior coating resists a very slight amount of electricity – approximately 3-14 milliohms (0.003-0.013 ohms) of resistance. Appx1494-1586; Appx1237; Appx2369.

21

Using a four-point test, plaintiff's witness, Dr. Jackson, measured the electrical resistance of the coating inside the conduit. The electrical resistance of uncoated conduit measured 2.5 milliohms and the coated conduit measured 70-120 milliohms (0.07-12 ohms). Appx0703-Appx0704. He also measured the electrical resistance using a two-point test. The resistance on the uncoated conduct measured 0.2 ohms and the resistance on the coated conduit measured 0.7-1.2 ohms. Appx0703-Appx0704. As a result of these findings, Dr. Jackson concluded that the interior coating "provides slightly higher electrical resistance than an uncoated pipe but does not act as an insulator." Appx0664. The trial court correctly held that the measurements conducted by the parties, of the resistivity of the coating inside the conduit, showed that the conduit would not "significantly" "impede[] the flow of electrical current in the type of wiring circuits that would be found in or around residential or commercial buildings." Appx0017.

Shamrock advertises its electrical conduit to the electrical industry with a product brochure, which is the only document Shamrock uses to convey information regarding the features and benefits of the product. Appx1588-Appx1589; Appx0970-Appx0971, Appx1463. While marketing materials are not dispositive of the classification of goods, such descriptions are evidence of what the parties, and, presumably the commercial world, consider the merchandise to be.

*Pillsbury Co. v. United States*, 431 F.3d 1377, 1380 (Fed. Cir. 2005); J.C. *Penny*

*Purchasing Corp. v. United States*, 10 Ct. Int'l Trade 727, 730 (1986).

The product brochure touts that the "[s]mooth **interior coating** insulates

[the] wall to provide easy installation of wire." (emphasis added). Appx1588-

Appx1589, Appx0985-0986. As the trial court correctly noted "[t]he brochure

makes no other reference to insulation and does not advertise the interior coating as

providing insulation from electrical current." Appx0014. Moreover, Shamrock is

not aware of any of its customers that purchase the electrical conduit specifically

"because the interior coating provides electrical insulation." Appx1024-

Appx1025.

Shamrock argues that the coating on the interior of the conduit contains

epoxy resin, melamine, and silicone, and that those substances have insulating

properties that are sufficient for purposes of heading 8547. App. Br. at 22-23.

However, the testing performed on the coating showed that the coating did not

significantly impede the flow of electricity. In fact, plaintiff's own witness, Dr.

Jackson, did not consider the degree of resistivity or resistance of the coating on

the interior of the conduit sufficient to qualify it as an insulator. Appx0664.

Shamrock's expert, Dr. Gotro, never determined the actual composition of the

interior coating. Dr. Gotro proffered an opinion on the general characteristics of

epoxy, melamine and silicone – and not on the actual coating on the interior of the

23

conduit.  During his deposition, Dr. Gotro testified that his opinion is a mere

deduction:

> Q. And then your third conclusion, you
> write: "Compositions containing epoxy, melamine,
> and silicone additives are known to be electrically
> insulating."  Right?
>
> A. Yes.
>
> Q. That's your third conclusion. So is it
> fair to say the statement that does not specifically
> refer to the internal coating at issue in this case,
> but, rather, compositions generally made up of
> these materials? Right?
>
> A. Correct.

Appx0333.

Indeed, Dr. Gotro, did not inspect samples of the electric conduit, was not

provided with the chemical composition of the epoxy coating, was not provided

with the methodology for development of the epoxy coating, and did not receive

information on the application of the coating.

> Q. Okay. And speaking of electrical conduit, why
> we're here today, are you familiar with the
> electrical conduit sold by the plaintiff, Shamrock,
> that is at issue in this case?
>
> A. At a high level, I've seen photographs of the pipe
> sample and I've read about the use of the pipe at
> very high level as electrical conduit in buildings
> and homes and that it's coated with an organic,
> specifically, composition that has three

components to allow the wires to go through the
conduit.

Q.    And when you say high level, why do you qualify
      it with that?

A.    Well, I have not been provided any of the details
      of like the chemical composition. We know there's
      only three components.

Q.    Sure.

A.     I've not been provided any details on the process
      to apply it, no details on the methodology they
      used to develop it, because according to the
      supplier of the coating, this is a proprietary trade
      secret.

Q.    We'll get into that in a little bit.  So when you say
      high level, have you physically examined the
      product?

A.    I have not physically touched the product.

Q.    You've seen pictures of it?

A.    Yes.

Appx0286-Appx0287.  *See also* Appx0323.  Dr. Gotro's opinion is of minimal

value as it is predicated on limited information regarding the coating.  Moreover,

Dr. Gotro did not opine on the actual epoxy coating at issue in this case.  Based on

the record, the trial court did not err in holding that the electrical conduit did not

fall within heading 8547, HTSUS.

## V.   THE TRIAL COURT CORRECTLY REJECTED SHAMROCK'S OVERLY BROAD INTERPRETATION OF THE TERM "LINED WITH INSULATING MATERIAL"

The trial court held that heading 8547, HTSUS, describes electrical conduit that performs an insulating function necessary or desirable for electrical wiring in applications for which the conduit is designed and for which it is marketed in commerce.  Appx0018.  Shamrock argues that the trial court "performed no analysis of the plain meaning of the statutory terms 'lined with insulating material" in heading 8547, and instead substituted its own definition.  App. Br. at 32.  Specifically, Shamrock takes issue with the trial court's construction of heading 8547 as requiring the insulated material to actually perform an insulating function with respect to the purpose of the conduit.  Shamrock's argument is without merit.

The trial court's statutory analysis of the terms of heading 8547 was comprehensive and correct.  Pursuant to GRI 1, the trial court examined the terms of heading 8547, HTSUS, and considered the meaning of those terms in the context of the HTSUS.  Indeed, the trial court held that the heading must be interpreted in the context of electricity.  The trial court recognized that heading 8547, HTSUS, and heading 7306, HTSUS, cover mutually exclusive categories of electrical conduit.  Thus, heading 8547, HTSUS, must be read in a manner that does not render heading 7306, HTSUS, surplusage.  Additionally, the trial court consulted the Explanatory Note to heading 8457, HTSUS, for guidance as to the

scope of the heading.  The trial court also considered the arguments that the parties

presented during oral argument.  Thus, in arriving at its interpretation of heading

8547, HTSUS, the trial court performed a thorough and correct statutory analysis.

Shamrock also argues that the trial court failed to explain why the tariff term

"lined with insulating material" "raised the question of" the effectiveness of the

"insulating material" contemplated by heading 8547, HTSUS.  App. Br. 31-32.

The trial court did however explain that it determined that heading 8547 was not

clear as to the specific function of the lining material.  Appx0015 ("The

merchandise at issue here presents the very question that makes the heading term

ambiguous.")  Although Shamrock argued that the coating is not required to

perform any specific function and can be "insulating in a chemical or mechanical

way," record evidence demonstrates that the coating "protects the wire from being

chafed, or scraped, or exposed."  Appx2350.  Thus, the trial court fully explained

its rationale for its interpretation of heading 8547 as being unclear.

Shamrock argues for a far broader construction of heading 8547 than the

trial court's construction.  Below, Shamrock vigorously argued that the term

"insulate" was not limited to electricity but "refers to the connotation of providing

a protective layer between an underlying article and something harmful."

Appx1392-Appx1393.  Shamrock now argues that an "insulating material" is "one

where the elements, constituents, or substances of which it is made prevent the

passage of electricity, heat, or sound." App. Br. at 26. Shamrock's overly broad

definition of the term "insulating material" is not supported by the plain language

of heading 8547 or the Explanatory Note to that heading. Moreover, Shamrock's

expansive interpretation of heading 8547 would improperly encroach on the scope

of the subheadings within heading 7306, HTSUS.

Shamrock's interpretation of the tariff term "insulating material" is flawed

for several reasons. Although Shamrock now agrees that the term "insulating

material" should be interpreted in the context of electricity, Shamrock's definition

curiously refers to "sound." Furthermore, Shamrock's expansive definition of

"insulating material" has no relation to the "electrical conduit tubing" that also

appears in the heading. Under Shamrock's interpretation, as long as the interior

coating of electrical conduit contains a substance that is generally known to have

insulating properties – no matter the amount or purpose of that substance in

relation to the coating – the conduit would be classifiable under heading 8547.

That cannot be a proper interpretation as it would render provisions within heading

7306 superfluous. As this Court has noted, provisions do not "exist in a vacuum,

and we must read it in conjunction with other relevant provisions to discern its

meaning." *Gerson Co. v. United States*, 898 F.3d 1232, 1236–37 (Fed. Cir. 2018)

*(citing La Crosse Tech. v. United States*, 723 F.3d 1353, 1361 (Fed. Cir. 2013))

(this Court reads tariff headings together and along with their respective

Explanatory Notes to conclude that they "set out mutually exclusive categories of meteorological devices"); *cf. King v. Burwell*, 576 U.S. 473, 135 S. Ct. 2480, 2489 (2015) ("[O]ftentimes the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.  So when deciding whether the language is plain, we must read the words in their context and with a view to their place in the overall statutory scheme. Our duty, after all, is to construe statutes, not isolated provisions." (citations and internal quotation marks omitted)).

Shamrock's interpretation treats "electrical conduit tubing" and "lined with insulating material" as two separate and unrelated terms.  The terms "electrical conduit tubing" and "lined with insulating material" appear in the same heading and, thus, should be construed together.  Therefore, the material that is intended to "insulate[]" must perform a function that relates to the purpose and function of the electrical conduit.

Shamrock further argues that the fact that subheadings within heading 8547 cover insulated fittings of *plastics* and *ceramics* means that the term "insulated materials" in the heading covers plastics and ceramics.  App. Br. 27, App. Br. 34. Shamrock's argument is contradicted by the principles of GRI 1.

The relevant portion of heading 8547, HTSUS, provides for:

> Insulating fittings for electrical machines, appliances or
> equipment, being fittings wholly of insulating material
> apart from any minor components of metal (for example,
> threaded sockets) incorporated during moulded solely for

29

the purposes of assembly, other than insulators of
heading 8546 . . . .

It is well-established that a subheading cannot be used to interpret a heading. Pursuant to GRI 1, the competing tariff headings "are to be evaluated without reference to their subheadings, which cannot be used to expand the scope of their respective headings." *R.T. Foods, Inc. v. United States*, 757 F.3d 1349, 1353 (Fed. Cir. 2014) (citing *Orlando Food Corp.*, 140 F.3d at 1440 ("Only after determining that a product is classifiable under the heading should the court look to the subheadings to find the correct classification for the merchandise.... [W]hen determining which heading is ... more appropriate for classification, a court should compare only the language of the headings and not the language of the subheadings.")).  The terms of a subheading are to be considered only after the correct heading has been determined.  *See, e.g.*, *Mondiv, Div. of Lassonde Specialties Inc. v. United States*, 329 F. Supp. 3d 1331, 1344 (2018) ("After the proper heading of the product is determined [under GRI 1], the court utilizes GRI 6 to determine the appropriate subheading.").  Heading 8547 does not identify any specific materials.  Thus, Shamrock's attempt to import "plastics" and "ceramics" from subheadings into the heading is impermissible under the GRIs.  The Court must first evaluate the heading, without reference to any subheadings.

Moreover, by its express terms, the "insulating fittings" covered by heading 8547, HTSUS, are very distinct in that they must be made "wholly of insulating material." Indeed, the relevant portion of the Explanatory Note to 8547 states:

> With the exception of insulators as such (heading 85.46), this group covers all fittings for electrical machinery, appliances or apparatus, provided:
>
> (i) They are wholly of insulating material, or are wholly of insulating material (e.g., plastics) apart from any minor components of metal (screws, threaded sockets, sleeves, etc.) incorporated during moulding solely for purposes of assembly.
> and
>
> (ii) They are designed for insulating purposes even though at the same time they have other functions (e.g., protection).

*See* Explanatory Note to 8547.

By virtue of the fact that the fittings of heading 8547 must be constructed out of "insulating materials", those materials (plastics and ceramics) cannot be a coating such as the epoxy coating on the interior of the conduit. Accordingly, Shamrock's overly broad interpretation should be rejected.

Shamrock also relies on two non-precedential cases, *Naftone, Inc. v. United States*, 67 Cust. Ct. 341 (1971), and *Inter-Maritime Forwarding Co., Inc. v. United States*¸ 70 Cust. Ct. 133 (1973) to further support its interpretation of heading 8547, HTSUS. App. Br. at 29-31. Shamrock argues these cases are instructive because the court distinguished between insulating material and articles properly

31

classified as "insulators" in section 773.30 of the Tariff Schedule of the United States (TSUS).  In both cases, the court concluded that the subject imported articles were not "insulators" of section 773.30, TSUS, because that term was found to have a specific meaning under the TSUS — *i.e.*, defining "insulators" as a piece of equipment designed to provide electrical insulation rather than the material that is used to create that equipment.  *Naftone, Inc.*, 67 Cust. Ct. at 347–48; *Inter-Maritime Forwarding Co., Inc.*¸ 70 Cust. Ct. at 139–40.  The TSUS provision at issue in *Naftone* and *Inter-Maritime Forwarding* is vastly different from the language of heading 8547, HTSUS.  This Court has held that cases involving the interpretation of the TSUS provisions that differ from the HTSUS are not instructive or binding.  *GRK Canada, Ltd v. United States*, 885 F.3d 1340 (Fed. Cir. 2018).  Therefore, *Naftone* and *Inter-Maritime Forwarding* have no bearing on correct interpretation of the meaning and scope of heading 8547, HTSUS.

Lastly, Shamrock's argument that the term "insulate" should be interpreted colloquially disregards the fact that the term appears in a tariff heading that is within Chapter 85 and Section XVI.  App. Br. at 61-63.  Both Chapter 85 and Section XVI cover "Electrical Equipment."  *See also* General Explanatory Note to Chapter 85 ("[t]his Chapter covers all electrical machinery and equipment.")

Furthermore, the drafters of heading 8547 did not use the term "insulating material" in isolation.  Rather it was used in conjunction with the "electrical

conduit tubing," which is a type of electrical equipment, that also appears in the heading.  Shamrock's reliance on *B.F. Goodrich Co. v. United States*, Cust. Ct. 72, 73 (1957), is misplaced because the phrase "insulating material" at issue in that case was not linked to another tariff term.  Consequently, the term "insulating material" must be interpreted as it relates to electrical conduit tubing and electrical equipment.

## VI.    THE TRIAL COURT DID NOT USE THE EXPLANATORY NOTES TO IMPROPERLY INTERPRET THE TERMS OF HEADING 8547

Shamrock argues that the trial court erroneously used the Explanatory Notes to headings 8547 and heading 7306 to alter the scope of the heading 8547.  App. Br. at 38.  The Explanatory Note to heading 8547 indicates that the heading covers metal tubing "provided it has an interior lining of insulated material" and advises that "uninsulated metal tubing" is excluded from the heading.  App. Br. at 38.  The Explanatory Note to heading 7306 states that the heading "excludes . . . *insulated electrical conduit tubing* (Heading 85.47)." (emphasis added).  The term "insulated electrical conduit tubing" does not appear in heading 8547.  According to Shamrock, the trial court incorrectly read the term "insulated electrical conduit tubing" from the Explanatory Note to 7306 into heading 8547 and found that the electrical conduit does not satisfy that extraneous statutory term.  App. Br. at 38.  Because "insulated electrical conduit tubing" does not appear in heading 8547, Shamrock argues that headings 8547 and 7306 do not draw a distinction between

"insulated electrical conduit tubing" and "uninsulated metal tubing."  App. Br. at 39.  Shamrock misinterprets the trial court's analysis of the Explanatory Notes.

The trial court read the Explanatory Notes to heading 8547 and 7306 together and confirmed that the two headings cover mutually exclusive categories of electric conduit.  The trial court did not interpret the Explanatory Note to heading 7306 as creating a separate category of electrical tubing, namely, "insulated metal tubing" with its own classification requirements.  The court simply used the term "insulated metal tubing" as a short-hand reference for the term "electrical conduit tubing lined with insulating material" in heading 8547.  The only category of goods that are classifiable in heading 8547 is electrical conduit tubing lined with insulating material.  Therefore, the reference to "insulated metal tubing" in the Explanatory Note to heading 7306 necessarily refers to "electrical conduit tubing lined with insulating material."

## VII.  THE TRIAL COURT DID NOT ERR REGARDING THE EXEMPLAR OF THE EXPLANATORY NOTE TO HEADING 8547 – INSULATING VARNISH

The Explanatory Note to heading 8547 identifies "insulating varnish" as an exemplar of insulating material covered by heading 8547.  During the trial court proceedings, Shamrock did not produce a single document (advertisement, specifications, etc.) that expressly described the actual epoxy coating as an insulating varnish.  Notwithstanding this lack of an evidentiary record, Shamrock

asserts that the epoxy coating qualifies as an "insulating varnish," and that the trial court failed to address and consider the standards governing "insulating varnish." App. Br. at 50. Shamrock further argues that electrically insulating varnishes are not applied as the primary insulation but "to contribute to the total mechanical strength, and the electrical, thermal, and chemical resistance." App. Br. at 33. According to Shamrock, the epoxy coating accomplishes those functions. App. Br. at 50.

The trial court is permitted wide discretion in determining which authorities it considers helpful and persuasive in interpreting the common meaning of a tariff term. *Brookside Veneers, Ltd.,* 847 F.2d at 789; *Marubeni Am. Corp.,* 35 F.3d at 534. Furthermore, Explanatory Notes are guidance and not binding on any court. Accordingly, no error was committed by the trial court in choosing to rely on other legal authorities instead of the "standards" for the exemplar "insulating varnish" in the Explanatory Note.

Notwithstanding the lack of error by the trial court, even if the court were to have considered the standards for "insulating varnish," Shamrock's argument lacks any probative value as Shamrock failed to show that the merchandise meets the factual criteria for the standards. One of the main characteristics of an insulating varnish is that it has superior dielectric strength. Appx1750. Shamrock has not shown that the interior epoxy coating has superior dielectric strength. In fact,

Shamrock's expert, Dr. Gotro, testified that he does not know the dielectric

strength of the interior coating:

> Q.    Do we know the dielectric strength of
>       the interior coating that's on Shamrock's conduit?
>
> A.    I do not.

Appx0318.

Below, Shamrock did not proffer any industry "standards" governing

insulating varnish or show that the epoxy coating satisfied industry standards.

Shamrock relied solely on definitions of "electrical insulating varnish" contained

in a thirty-year old article from the "IEEE Electrical Insulation Magazine."  The

American Society for Testing Materials (ASTM), however, has actual

specifications governing the testing and values of electrical varnishes, such as

ASTM D4733, which is cited in the article.  Shamrock has not presented any facts

to establish that the epoxy coating satisfies ASTM's actual technical specifications.

The National Electrical Manufacturers Association (NEMA) has standards relating

to insulating varnish.  Shamrock cited NEMA's definition from the same article

but failed to provide any documents demonstrating that the epoxy coating meets

NEMA's technical criteria.  Notably, the article from the "IEEE Electrical

Insulation Magazine" states that there are typically data sheets or brochures for

electrically insulating varnish that sets forth the tensile strength, volume resistivity,

and percent shrinkage. Appx1713. Shamrock has not produced a data sheet or brochure setting forth any of those properties for the epoxy coating.

Furthermore, the Explanatory Note to heading 8547 states that varnish applied for the sole purpose of preventing rust is not a "special electrically *insulating* varnish" for purposes of the heading. The UL listing for the electrical conduit identify the conduit's specifications. Appx1588-1589, Appx1675. UL, 797 which applies to the subject electrical conduit, requires that interior organic coating have "the ability to provide the level of corrosion resistance necessary where the coating is not subject to physical damage." Appx1594-1630. Shamrock's president and Dr. Jackson confirm that the interior coating serves this purpose. Appx0950. Shamrock applied the coating to prevent rust, and not to insulate the conduit. The record evidence shows that Shamrock's electrical conduit is not lined with "special electrically insulating" varnish, and therefore it is not classifiable in heading 8547, HTSUS.

## VIII.  THE TRIAL COURT IS NOT BOUND BY ADMINISTRATIVE RULINGS

Shamrock relies on several CBP administrative rulings to support is interpretation of heading 8547, HTSUS. Shamrock argues that the trial court "failed to explain how Customs rulings regarding Heading 8547 were not persuasive" and not entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Customs rulings and positions are entitled to the deference

described in *Skidmore v. Swift & Co.,* 323 U.S. 134 (1944) (*Skidmore*). When determining the degree of deference to accord a Customs ruling or position, the writer's thoroughness, logic and expertise, the ruling's conformity with prior interpretations, and any other sources of weight are factors to be evaluated. *See also Heartland By-Products, Inc. v. United States*, 264 F.3d 1126, 1135 (Fed. Cir. 2001). Although CBP's rulings are relevant insofar as they have to the "power to persuade" (*United States v. Mead Corp.*, 533 U.S. 218, 235 (2001)), they are not binding on the Court (*see MetChem, Inc. v. United States*, 513 F.3d 1342, 1345 (Fed. Cir. 2008)), and rulings are not entitled to deference when they do not pertain to the merchandise under consideration. *Lerner New York, Inc. v. Untied States*, 908 F. Supp. 2d 1313, 1331 (Ct. Int'l Trade 2013).

The trial court is not bound by CBP's administrative rulings. In a civil action brought pursuant to 19 U.S.C. § 1515 contesting the denial of an administrative protest filed in accordance with 19 U.S.C. § 1514(a), a party invokes the jurisdiction of the Court under 28 U.S.C. § 1581(a). Under 28 U.S.C. § 1581(a), the trial court reviews CBP's classification determination *de novo* based on the pleadings and record before it. *See* 28 U.S.C. § 2640(a)(1). *See also* Appx2348 (Customs' rulings "are not binding on me.") Here, the trial court correctly rendered its decision based on the pleadings and the judicial evidentiary

record.  Accordingly, the lack of reliance on CBP's administrative rulings shows no error by the trial court.

## CONCLUSION

For the reasons discussed above, the trial court's judgment should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

By: /s/ Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Marcella Powell
Of Counsel:                        MARCELLA POWELL
                                   Senior Trial Counsel
                                   Civil Division
                                   Commercial Litigation Branch
                                   Department of Justice
VALERIE SORENSON-CLARK            26 Federal Plaza- Suite 346
Office of the Assistant Chief Counsel  New York, New York 10278
International Trade Litigation     Tel. (212) 264-9230
U.S. Customs and Border Protection  Attorneys for Defendant-Appellee

Dated:  September 22, 2023

## CERTIFICATE OF COMPLIANCE
## PURSUANT TO FRAP 32(a)(7)(C)

| | | |
|---|---|---|
| SHAMROCK BUILDING MATERIALS, INC. | : | |
| Plaintiff-Appellant, | : | Appeal No. 2023-1648 |
| v. | : | |
| UNITED STATES, | : | |
| Defendant-Appellee. | : | |

I, MARCELLA POWELL, a trial attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field Office, who is responsible for the foregoing brief, relying upon the Microsoft Word Count feature of the word processing program used to prepare the brief, certify that this brief complies with the type-volume limitation under Rule 32(a)(7)(B) and contains 8,608 words.

/s/ Marcella Powell
Marcella Powell