# United States Court of Appeals for the Federal Circuit

---

**SHAMROCK BUILDING MATERIALS, INC.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2023-1648

---

Appeal from the United States Court of International Trade in No. 1:20-cv-00074-TCS, Senior Judge Timothy C. Stanceu.

---

Decided: October 23, 2024

---

PATRICK D. GILL, Sandler, Travis & Rosenberg, P.A., New York, NY, argued for plaintiff-appellant. Also represented by DONALD CAMERON, JR., NICHOLAS DUFFEY, MARY HODGINS, JULIE MENDOZA, BRADY MILLS, R. WILL PLANERT, Morris Manning & Martin LLP, Washington, DC.

NICO GURIAN, Commercial Litigation Branch, Civil Division, Department of Justice, New York, NY, argued for defendant-appellee. Also represented by AIMEE LEE, JUSTIN REINHART MILLER, MARCELLA POWELL, MATHIAS RABINOVITCH; VALERIE SORENSEN-CLARK, International

Trade Litigation, United States Customs and Border Protection, New York, NY.

---

Before TARANTO, HUGHES, and CUNNINGHAM, *Circuit Judges*.

TARANTO, *Circuit Judge*.

Shamrock Building Materials, Inc. imported into the United States from Mexico steel tubing having a thin interior coating mainly composed of epoxy, melamine, and silicone additives. The United States Customs and Border Protection (Customs) classified the conduit under heading 7306 of the Harmonized Tariff Schedule of the United States (HTSUS), which covers "[o]ther tubes, pipes . . . of iron or nonalloy steel." Shamrock protested, urging classification under heading 8547 of the HTSUS, which covers "[e]lectrical conduit tubing . . . of base metal *lined with insulating material*." (Emphasis added.) Customs rejected the protests. Shamrock filed an action in the Court of International Trade (Trade Court), which granted summary judgment to the United States, upholding the classification under heading 7306. *Shamrock Building Materials, Inc. v. United States*, 619 F. Supp. 3d 1337 (Ct. Int'l Trade 2023) (*Shamrock*). On Shamrock's appeal, we now affirm.

# I

## A

Shamrock imports electrical metallic tubing and intermediate metal conduit produced by Conduit S.A. de C.V. (doing business as RYMCO) in Mexico. *Id.* at 1341; J.A. 143. Both types of conduit are at issue here, and both are hollow concentric tubes of steel, sold in ten-foot lengths, though they have different wall thicknesses. *Shamrock*, 619 F. Supp. 3d at 1341. Pieces of the conduit can be connected by threaded steel couplings "to form a 'raceway'

for the routing of electrical wiring" in commercial and residential buildings "while protecting the wires within from external forces." *Id.*

The conduit is coated on the outside with zinc (which helps prevent rust) and, what is central here, on the inside with a compound that is composed principally of epoxy resin, melamine resin, and silicone additives (other ingredients not having been disclosed by the coating's manufacturer, Pinturas Diamex, S.A., which sold it to RYMCO). *See id.*; J.A. 144 ¶¶ 2–3, 910:6–11, 941:3–42:9, 954:12–55:6, 1412 ¶¶ 2–3, 1591–92, 1803 ¶ 8, 1804 ¶ 11. The interior coating, which was measured to be between 10 and 60 microns in thickness, functions at least in part to facilitate the installation of electrical wires within the conduit by protecting them from abrasion and tears resulting from friction created when pulling wires through the conduit. *See Shamrock*, 619 F. Supp. 3d at 1341; J.A. 1455 ¶ 7, 1803 ¶ 9. Shamrock has emphasized that installation function in marketing. A brochure used to advertise one of the conduits at issue states: "Smooth interior coating insulates wall to provide easy installation of wire." J.A. 1589. It is undisputed, based on testing for this case, that the coating also provides a nonzero amount of resistance to electrical current flow. *See Shamrock*, 619 F. Supp. 3d at 1345.[1] But the parties dispute the relevance

---

[1] *See id.* at 1345 ("Plaintiff's witness measured the resistivity of the coating inside the conduit to be between 120 milliohms and 1.2 ohms, depending on the testing method, and defendant's witness measured the resistivity as much less than that."); *id.* at 1345 n.5 ("Using a two-point test, plaintiff's witness measured 0.2 ohms of resistivity on uncoated pipe and between 0.7 and 1.2 ohms of resistivity on the coated pipe. Using a four-point test, plaintiff's witness measured the resistivity of the uncoated

of that resistance amount to the HTSUS classification question in this case. They also dispute the relevance of the facts, found by the Trade Court, that "[t]he parties are unaware of any customers who purchased the conduit from Shamrock specifically 'because the interior coating provides electrical insulation'" and that the above-noted marketing brochure, while noting the benefit to installation, "does not advertise the interior coating as providing insulation from electrical current." *Id.* at 1341, 1344.

B

Shamrock made 201 entries of conduit into the United States between June and October 2018. *Id.* at 1339. Between April and July 2019, Customs classified the conduit under heading 7306 of the HTSUS, which is within chapter 73 ("[a]rticles of iron or steel") of the HTSUS, itself within Section XV (including "ARTICLES OF BASE METAL"). *Id.* at 1339, 1342–43. (There is no dispute here about what HTSUS language is at issue, which is from the 2018 editions. *Id.* at 1340 n.2.) Specifically, Customs classified the conduit, according to its wall thickness, either under subheading 7306.30.1000, HTSUS, which covers

> [o]ther tubes, pipes, and hollow profiles . . . welded, of circular cross section, of iron or nonalloy steel . . . [h]aving a wall thickness of less than 1.65 mm

or under subheading 7306.30.5028, HTSUS, which covers

---

pipe to be 2.5 milliohms and the coated pipe to be 120 milliohms. Defendant's witness measured the resistivity of the lining to be between 3.419 and 14.043 milliohms.") (citations omitted). The Trade Court noted the absence of any substantial evidence that the coating impedes heat flow, at least in the intended use. *Id.* at 1345–46.

> [o]ther tubes, pipes and hollow profiles . . . welded, of circular cross section, of iron or nonalloy steel . . . [h]aving a wall thickness of 1.65 mm or more . . . [w]ith an outside diameter not exceeding 114.3 mm . . . [g]alvanized . . . *[i]nternally coated or lined with a non-electrically insulating material* suitable for use as electrical conduit (emphasis added).[2]

---

[2] More fully, subheading 7306.30.1000 reads:

> 7306. Other tubes, pipes and hollow profiles (for example, open seamed or welded, riveted, or similarly closed), of iron or steel:
> * * *
> 7306.30. Other, welded, of circular cross section, of iron or nonalloy steel:
> 7306.30.1000. Having a wall thickness of less than 1.65mm.

Subheading 7306.30.5028 reads more fully:

> 7306. Other tubes, pipes and hollow profiles (for example, open seamed or welded, riveted, or similarly closed), of iron or steel:
> * * *
> 7306.30. Other, welded, of circular cross section, of iron or nonalloy steel:
> * * *
> 7306.30.5028. Having a wall thickness of 1.65 mm or more:
> * * *
> Other
> * * *
> Other:
> With an outside diameter not exceeding 114.3 mm:
> Galvanized:
> * * *

Those classifications produced a 25 percent import duty because of the tariffs imposed on steel starting in 2018 under Section 232 of the Trade Expansion Act of 1962, *as amended*, 19 U.S.C. § 1862—without which no duty would have been assessed. *See Shamrock*, 619 F. Supp. 3d at 1343.

Shamrock timely filed protests before Customs under 19 U.S.C. § 1514, arguing that the conduit should have been classified under heading 8547 of HTSUS, which is within Chapter 85 ("[e]lectrical machinery and equipment and parts thereof"), itself within Section XVI (including "ELETRICAL EQUIPMENT; PARTS THEREOF"). *Shamrock*, 619 F. Supp. 3d at 1339, 1343. Specifically, Shamrock argued that the conduit should be classified under subheading 8547.90.0020, which covers

> [e]lectrical conduit tubing and joints therefor, of base metal lined with insulating material . . . [c]onduit tubing.[3]

---

Internally coated or lined with a non-electrically insulating material, suitable for use as electrical conduit.

[3] More fully, subheading 8547.90.0020 reads:

8547. Insulating fittings for electrical machines, appliances or equipment, being fittings wholly of insulating material apart from any minor components of metal (for example, threaded sockets) incorporated during molding solely for the purposes of assembly, other than insulators of heading 8546; electrical conduit tubing and joints therefor, of base metal lined with insulating material:

* * *

8547.90. Other

* * *

That classification would have resulted in a duty of 4.6 percent or zero. *See Shamrock*, 619 F. Supp. 3d at 1343.[4]

Customs denied Shamrock's protests, under 19 U.S.C. § 1515, on November 7 and December 9, 2019, affirming its classification under heading 7306. *Id.* at 1339. Within the time allowed by 28 U.S.C. § 2636(a), and invoking 28 U.S.C. § 1581(a), Shamrock sued the United States in the Trade Court to challenge the protest denials (and hence the classifications) by filing its summons on April 6, 2020 (then following up with a complaint on May 20, 2020). *See id.* at 1340; J.A. 28–29; 28 U.S.C. § 2632(b) (suit to challenge protest denial under 19 U.S.C. § 1515 initiated by filing summons). Shamrock and the United States filed cross-motions for summary judgment. *See Shamrock*, 619 F. Supp. 3d at 1339–40. The parties disagreed about the interpretation and applicability of heading 8547, specifically subheading 8547.90.0020—which defined the issue for decision, because there was and is no dispute that, if heading 8547 is inapplicable, then Customs' classification within heading 7306 must be approved.

The Trade Court held that heading 8547 does not apply. *Shamrock*, 619 F. Supp. 3d at 1339–48. The court adopted

---

8547.90.0020. Electrical conduit tubing and joints therefor, of base metal lined with insulating material: Conduit tubing

[4] At the relevant time, goods within subheading 8547.90.0020 were subject to a general (Column 1) duty of 4.6 percent but would enter free of duty if they qualified for preferential treatment under the North American Free Trade Agreement Implementation Act (NAFTA). *Id.* at 1343 (citing General Note 12, HTSUS). According to Shamrock, Customs informed it on November 15, 2018, that the conduit qualified for the preferential treatment. *See* Complaint at 6–7 ¶¶ 36, 38, *Shamrock*, No. 1:20-cv-00074 (ECF # 10, May 20, 2020).

an interpretation of the phrase of heading 8547 that is in dispute—"electrical conduit tubing . . . of base metal lined with insulating material." *Id.* at 1344–46. That phrase, the court held, requires a level of impeding current flow (or heat) to the metal tube that is viewed as significant in the commercial context defined by the intended use to surround electricity-conducting wiring. *Id.* at 1346 ("The court interprets heading 8547, HTSUS in a common and commercial context to describe electrical conduit that performs an insulating function necessary or desirable for electrical wiring in applications for which the conduit is designed and for which it is marketed in commerce."); *id.* ("the insulating layer must function in a way that relates to the 'electrical conduit' function, i.e., it must impede electrical current or isolate the heat from the wire from the inside surface of the steel conduit").

Under that interpretation, the Trade Court ruled, Shamrock's conduit did not come within heading 8547. On the factual matters relevant under the adopted interpretation, Shamrock did not overcome the presumption of correctness of Customs' classification by carrying its burden of proving the classification to be incorrect. *Id.* at 1342, 1348. The court found that "the uncontested facts are inconsistent with a finding that the coating 'insulates' the interior wire so as to impede the transfer of electrical current or heat when the conduit is used for its intended purpose"; although "the coating inside the subject conduit provides some measurable resistance (or 'resistivity') to the flow of electric current when compared to the same pipe when uncoated," "the uncontested facts also demonstrate that the degree of resistivity is not significant in relation to the intended use of the conduit." *Id.* at 1345. "Notably," the court explained, Shamrock "does not contend that the coating provides significant protection from current flow or heat, and the brochure" promoting conduit at issue "does not make any such claims." *Id.* at 1345–46.

Based on the interpretation of heading 8547 and the facts found, the Trade Court held that Shamrock's electrical conduit "is not 'electrical conduit . . . of base metal lined with an insulating material' within the meaning of that term as used in the article description for heading 8547, HTSUS." *Id.* at 1346 (quoting heading 8547, HTSUS). The conduit at issue "is instead described by the terms of heading 7306." *Id.* (quoting heading 7306, HTSUS). The court granted summary judgment in favor of the United States on March 13, 2023, and entered judgment on that date. *Id.* at 1337, 1339, 1348; J.A. 1–2.

Shamrock timely appealed. This court has jurisdiction under 28 U.S.C. § 1295(a)(5).

## II

### A

We review the Trade Court's grant of summary judgment without deference. *CamelBak Products, LLC v. United States*, 649 F.3d 1361, 1364 (Fed. Cir. 2011). Proper classification of goods under the HTSUS requires two steps: "first ascertaining the meaning of specific terms in the tariff provisions and then determining whether the subject merchandise comes within the description of those terms." *Victoria's Secret Direct, LLC v. United States*, 769 F.3d 1102, 1106 (Fed. Cir. 2014) (quoting *Millenium Lumber Distribution Ltd. v. United States*, 558 F.3d 1326, 1328 (Fed. Cir. 2009)); *see R.T. Foods, Inc. v. United States*, 757 F.3d 1349, 1352 (Fed. Cir. 2014). The first step involves an issue of law we decide de novo, the second an issue of fact whose resolution by the Trade Court we review only for clear error. *Victoria's Secret*, 769 F.3d at 1106; *see R.T. Foods*, 757 F.3d at 1352; *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1439 (Fed. Cir. 1998).

Under 28 U.S.C. § 2639(a)(1), the Customs classification decision at issue here "is presumed to be correct" and "[t]he burden of proving otherwise shall rest

upon the party challenging such decision." *See*, *e.g.*, *Universal Electronics Inc. v. United States*, 112 F.3d 488, 491 (Fed. Cir. 1997); *Millenium Lumber*, 558 F.3d at 1328. The statutory presumption of correctness applies only to factual issues. *See Goodman Manufacturing, L.P. v. United States*, 69 F.3d 505, 508 (Fed. Cir. 1995) (presumption "not relevant" where there is no factual dispute). It is a "procedural device that is designed to allocate, between the two litigants to a lawsuit, the burden of producing *evidence* in sufficient quantity. Specifically, the importer must produce evidence (the burden of production portion of the burden of proof) that demonstrates by a preponderance (the burden of persuasion portion of the burden of proof) that Customs' classification decision is incorrect." *Universal Electronics*, 112 F.3d at 492; *see also*, *e.g.*, *Timber Products Co. v. United States*, 515 F.3d 1213, 1219 (Fed. Cir. 2008); *Libas*, *Ltd. v. United States*, 193 F.3d 1361, 1365 (Fed. Cir. 1999).

B

The HTSUS is composed of headings, each of which "set[s] forth general categories of merchandise," and "has one or more subheadings" that "provide a more particularized segregation of the goods *within* each category." *E.g.*, *Orlando Food Corp.*, 140 F.3d at 1439 (emphasis added); *Schlumberger Technology Corp. v. United States*, 845 F.3d 1158, 1163 (Fed. Cir. 2017); *Otter Products, LLC v. United States*, 834 F.3d 1369, 1375 (Fed. Cir. 2016); *Wilton Industries, Inc. v. United States*, 741 F.3d 1263, 1266 (Fed. Cir. 2013); *see also* U.S. Int'l Trade Comm., Preface to the 30th Edition: Guide to the HTS and Statistical Reporting, at 2 n.5 (Jan. 1, 2018) (explaining that a subheading "cover[s] a subset of the heading's product scope"); *Sigma-Tau HealthScience, Inc. v. United States*, 838 F.3d 1272, 1280–81 (Fed. Cir. 2016) (relying on this structural relationship).

The headings and subheadings are enumerated in chapters, each of which has its own section and chapter notes. *R.T. Foods*, 757 F.3d at 1353. Congress also prescribed, among other things, "General Rules of Interpretation" (GRI) for HTSUS. *Id.* Classification analysis begins with GRI 1, which states that "for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes." *See Orlando Food*, 140 F.3d at 1440. "Absent contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings, which are presumed to be the same. A court may rely upon its own understanding of the terms used and may consult lexicographic and scientific authorities, dictionaries, and other reliable information sources." *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999) (internal citation omitted). After consulting the headings and relevant section or chapter notes, we may also consult the relevant Explanatory Notes. *Kahrs International, Inc. v. United States*, 713 F.3d 640, 644–45 (Fed. Cir. 2013) (citation omitted). In contrast to "section or chapter notes," which are binding, Explanatory Notes "are not legally binding or dispositive," but they often help resolve an interpretive dispute because they "are generally indicative of the proper interpretation of the various HTSUS provisions." *Id.*; *see Sigma-Tau*, 838 F.3d at 1280–81. Other GRIs lay down other classification rules (such as GRI 3's preference for the specific over the general, *see Orlando Food*, 140 F.3d at 1440–41), but the principles just described control the decision in the present case.

## III

The only question here is whether heading 8547 applies to the conduit at issue. The note to section XV, where heading 7306 resides, excludes articles classified under section XVI, where heading 8547 resides. HTSUS, Section XV, Note 1(f) at XV-1 ("This section does not cover: . . . [a]rticles of section XVI (machinery, mechanical

appliances and electrical goods) . . . ."). It is not disputed here that if heading 8547 applies to the conduit, heading 7306 does not apply and that, if heading 8547 does not apply, heading 7306 does. *See Shamrock*, 619 F. Supp. 3d at 1343–44.

In this case, the dispute before us reduces to a dispute about the interpretation of heading 8547. We interpret the key language of the heading as requiring commercially significant insulation of the conduit against current flow (and perhaps heat flow) from an electricity-conducting wire inside the conduit, and we see no material difference between that interpretation and the interpretation set forth and applied in the Trade Court's opinion. *See*, *e.g.*, *Shamrock*, 619 F. Supp. 3d at 1346. Shamrock disputes that interpretation, but if we adopt it, as we do, no further issue needs to be decided for us to affirm the judgment before us.

That is because, on appeal, Shamrock does not make a procedural argument that, even under that interpretation, the Trade Court erred in deciding the case on summary judgment rather than proceeding to a trial. And it has not shown any basis for setting aside the Trade Court's determination that Shamrock did not present evidence that would allow a finding that the coating provided *commercially significant* dampening of current or heat flow between a conducting wire and the metal conduit. Indeed, Shamrock admitted that it is "unaware of 'any customers that have stated' that they purchase the electrical conduit exclusively because of it[s] electrical insulating properties rather than its protective insulating properties." J.A. 1805 ¶ 14. The only marketing brochure in the record mentions an installation benefit and "[p]hysical and mechanical protection," but not in-use protection against current or heat flow. J.A. 1589; *see also id.* (brochure noting that conduit affirmatively provides "system grounding," which the government expert testified means that "the conduit and interior coating must be a good conductor of

electricity," J.A. 1499 ¶ 28). Finally, even if litigation-prompted testing could substitute for marketplace evidence, the Trade Court determined that the testing here could not be found to do so if the standard was one of commercial significance, and Shamrock has not shown error in that determination. *See Shamrock*, 619 F. Supp. 3d at 1345.

We therefore turn to the dispute about the correct interpretation of heading 8547—specifically, about the phrase, "electrical conduit tubing . . . of base metal lined with insulating material." We explain our conclusion about the proper interpretation in steps.

First: We reject Shamrock's suggestion that heading 8547 covers any lining that contains, among its ingredients, materials (such as epoxy resins or silicone) that standing alone are recognized as insulating materials. The natural reading of "lined with insulating material" is that the "lin[ing]" (considered as a unit) must be a "material" that is "insulating." Otherwise, in Shamrock's apparent view, the heading would cover a material that, while containing insulating compounds, also contains highly conducting material, for example, so that the lining as a whole is anything but insulating. *See* J.A. 308 (testimony of Dr. Jeffrey T. Gotro, expert witness for Shamrock, confirming that even materials that are composed mostly of constituents with insulating properties, like epoxy, can nonetheless be "conductive" and "fail to insulate against electricity" when combined with other materials, such as "metallic filler[s]").

Second: The term "insulate" (in its several word forms) can be used to cover protection of various kinds—*e.g.*, against rust-causing oxygen, current or heat flow, sound, and perhaps abrasion. But heading 8547, understood in context, does not cover all kinds of "insulating." The "insulating" that counts for heading 8547 is best understood to mean protection against the passage of

current (and/or heat) from an electricity-conducting wire through the lining to the metal tubing.

That understanding is immediately suggested by the opening words of the heading 8547 phrase in dispute. What is being lined is "electrical conduit tubing." That language, indicating an intended use, suggests that the identified property of the lining be tied to the use—here, of insulating electricity-conducting wires inside the conduit. *See Shamrock*, 619 F. Supp. 3d at 1346. Moreover, the parties agree that headings 8547 and 7306 create a structural dichotomy: For the steel conduit at issue, if it comes within heading 8547, it is outside heading 7306, and vice versa. Appellant's Br. at 7, 44; Appellee's Br. at 17. The fairest inference is that the "insulating" property of heading 8547 is the property of being "electrically" insulating.

That conclusion is confirmed by relevant explanatory notes—which can be, and here are, persuasive, though they are not binding. Explanatory Note 85.47 and Explanatory Note 73.06 "draw a distinction between electrical conduit tubing that is 'insulated' and electrical conduit tubing that is 'uninsulated,'" with the former covered by heading 8547 and the latter by heading 7306. *Shamrock*, 619 F. Supp. 3d at 1345. The language used in the explanatory notes to characterize the two headings—"insulated" versus "uninsulated"—confirms that "insulating" in heading 8547 means electrically insulating (though the word "electrically" is not used), because metal tubes lined or coated with non-electrically insulating material fall within heading 7306. *Compare* Explanatory Note 73.06 (excluding "[i]nsulated electrical conduit tubing (heading 85.47)" from heading 7306), *with* Explanatory Note 85.47 (explaining that "uninsulated metal tubing, often used for the same purpose [*i.e.*, permanent electrical installations], is excluded" from heading 8547). *See also Shamrock*, 619 F. Supp. 3d at 1345. In addition, Explanatory Note 85.47 excludes "[m]etal tubing simply coated with varnish to

prevent corrosion," thus excluding one form of insulation, namely from oxygen or other corrosive elements or compounds.

Third: As to how to identify what is electrically insulating within heading 8547, the most sensible standard is one tied to the intended purpose of the commercial product: the provision of a commercially significant degree of electrical insulation when an electricity-conducting wire is in use in the conduit. Both parties view electrical resistance as an appropriate lens through which to assess insulating properties. *See* J.A. 157 ¶¶ 105–108, 858, 1223–24, 1496–97 ¶ 17, 1522. Shamrock has suggested that any positive number in electrical-resistance tests, no matter how close to zero, should suffice for a lining to be electrically insulating, but it offers no persuasive basis for such a conclusion. Resistance appears in degrees, on a continuous scale, and a standard is needed to identify how much is enough for a product to be electrically insulating.

Compositional makeup affects a lining's insulating properties, as does thickness. *See* J.A. 318 (testimony of Shamrock witness, Dr. Gotro); J.A. 1222 (testimony of government expert, Dr. Athanasios Meliopoulos); J.A. 1592 (letter from Pinturas Diamex, S.A., manufacturer of the coating material at issue here). But those facts do not resolve how much resistance is required. The most appropriate standard, we conclude, is what the commercial marketplace deems significant when the product is used as intended (when a conducting wire is in use in the conduit). That interpretation fits the established preference for "common and commercial meanings," *Carl Zeiss*, 195 F.3d at 1379, and aligns with our recognition that intended use can identify meaning even of an *eo nomine* classification, *GRK Canada Ltd. v. United States,* 761 F.3d 1354, 1358–59 (Fed. Cir. 2014), and that "how the subject articles are regarded in commerce" and "how the subject articles are described in sales and marketing literature" can "guide the

court's assessment of whether articles fall within the scope of an *eo nominee* provision," *CamelBak*, 649 F.3d at 1364–65, 1368; *Sigma-Tau*, 838 F.3d at 1279. And it may be implemented by facts from the marketplace, such as promotions of the products at issue, including perhaps comparisons to the amount of resistance provided by products clearly outside heading 8547, such as metal tubing simply coated with varnish to prevent corrosion or coated with non-electrically insulating material covered by heading 7306. Explanatory Note 85.47.

One final point: Shamrock cites several prior administrative rulings by Customs, such as HQ 966525, HQ 966526, Ruling N306508, Ruling N290590, and Ruling NY I84073, that classify lined electrical conduit (or other electrical products) in heading 8547 without speaking to whether and how to assess the degree of the electrically insulating property of the relevant lining material. *See, e.g.*, J.A. 1335–41, 1344–50, 1356–57, 1360, 1364. But the cited rulings do not provide any analysis of how to interpret "lined with insulating material" or determine what degree of "insulating" function, compared to "non-electrically insulating material[s]," is required. In this circumstance, we do not find the earlier rulings to warrant deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944); *see also Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2259, 2267 (2024), or otherwise to alter our conclusion.

## CONCLUSION

For the foregoing reasons, we affirm the Court of International Trade's grant of summary judgment in favor of the United States.

**AFFIRMED**